## AFFIDAVIT OF DEA SPECIAL AGENT SEAN GEARY

I, Sean Geary, Special Agent with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I have been a Special Agent with the DEA since 2019. I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, a multi-agency working group comprised of the DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other state and local agencies, whose mission is to identify, investigate, disrupt, and dismantle large-scale, violent drug trafficking organizations operating in the District of Massachusetts. Prior to my employment with DEA, I was employed as a Yarmouth, Massachusetts police officer for seven years.

2.      My responsibilities as a DEA Special Agent include the investigation of possible violations of federal law, including but not limited to violations of the Controlled Substances Act. As a Special Agent, I have participated in the investigations of criminal organizations involved in the distribution of controlled substances and related money laundering violations. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, acting in an undercover capacity, making arrests, and debriefing defendants, informants and witnesses who had personal knowledge about major drug trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. I have also received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotic traffickers to conceal and launder the proceeds of their narcotics-trafficking activities. Through my training and

experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

3.      Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephones numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is being submitted in support of an application for a search warrant for the following target location which is described in greater detail below and in Attachment A: 60 Tyler Street, Apartment #1, Boston, Massachusetts (the "Target Location") which is Jovani SANTIAGO's residence.

5.      As set forth herein, there is probable cause to believe that Erison Jose CUELLO-NUNEZ ("CUELLO-NUNEZ"), Roberto Toledo SANCHEZ ("SANCHEZ"), Wander CUELLO ("WANDER"), Kesendry MATEO Diaz, a/k/a "Tulile" ("TULILE"), JOSE VAZQUEZ, Jovani SANTIAGO ("SANTIAGO"), and others known and unknown (the "Target Subjects") have violated 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance) and 21 U.S.C. § 843(b)(3) (the use of a communication facility in the commission of

drug trafficking offenses) (the "Target Offenses") and that and that evidence, fruits, and instrumentalities of the Target Offenses will be found in the Target Location.

6.      This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that that evidence of the Target Offenses, described more fully in Attachment B, exists in the Target Location, described more fully in Attachment A.

## Procedural History

7.      On November 7, 2022, the Honorable Denise J. Casper, United States District Judge, District of Massachusetts, issued an Order authorizing investigators to intercept wire communications over cellular phones, including (617) 818-2015 (Target Telephone 1, used by CUELLO-NUNEZ) and wire and electronic communications over (857) 258-6481 (Target Telephone 4, used by SANCHEZ).

8.      On December 12, 2022, Judge Casper signed an Order authorizing the interception of wire and electronic communications over seven cellular phones, including (857) 424-4645 (Target Telephone 6) and (617) 224-2940 (Target Telephone 8). On January 10, 2023, Judge Casper signed an Order authorizing the continued interception of wire communications over Target Telephone 6 and the continued interception of wire and electronic communications over Target Telephone 8.

9.      On December 27, 2022, the Honorable Judith G. Dein, United States Magistrate Judge, District of Massachusetts, issued warrants authorizing investigators to obtain location data for cellular phones, including Target Telephones 6 and 8 [Dkt. Nos. 22-5460 to 5473-JGD].

10.      On February 6, 2023, Magistrate Judge Dein issued a criminal complaint charging CUELLO-NUNEZ, SANCHEZ, WANDER, and others with conspiracy to possess with intent to

distribute and to distribute controlled substances, including 50 grams or more of methamphetamine, a schedule II controlled substance, and 400 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

### Probable Cause

11.     In June 2022, the DEA Boston Strike Force began investigating a drug trafficking organization ("DTO") led by CUELLO-NUNEZ. Since interceptions over Target Telephones began on November 7, 2022, investigators learned that the CUELLO-NUNEZ DTO was distributing fentanyl, methamphetamine, and cocaine. As detailed below, interceptions led to drug seizures and surveillance that confirmed that the DTO was distributing vast quantities of methamphetamine, fentanyl, and cocaine. The CUELLO-NUNEZ DTO used the Spanish words for red ("roja"), black ("negra"), and brown ("marron"), "tina," and water ("agua") when directing couriers to deliver particular drugs to customers. Based on the investigation and drug seizures, investigators believe roja is code for cocaine, negra/marron is code for fentanyl, and agua and tina are code for methamphetamine.

12.     As detailed below, SANTIAGO was intercepted over Target Telephones 6 (talking to CUELLO-NUNEZ) and 8 (talking to SANCHEZ) using two different numbers: (857) 333-7080 (the "7080 Number") and (774) 322-6392 (the "6392 Number"). The 7080 Number was subscribed to "Jovani Santiago, 60 Tyler Street, Hyde Park, Massachusetts." Further calls indicate that CUELLO-NUNEZ supplied drugs, believed to be fentanyl, to SANTIAGO on at least two occasions in January 2023. SANCHEZ, who is SANTIAGO's uncle, arranged a meeting between CUELLO-NUNEZ and SANTIAGO in which SANTIAGO offered to hand over some of his prime drug customers to CUELLO-NUNEZ and SANCHEZ before he went to jail.

13.     On August 25, 2020, SANTIAGO was charged by federal criminal complaint with distribution of and possession with intent to distribute 400 grams or more of fentanyl. That same day, agents executed a search warrant at SANTIAGO's residence (the Target Location) [Dkt. No. 20-mj-2481-MBB]. During the 2020 search of the Target Location, investigators seized $6,000, a Sig Sauer 9mm handgun, and ammunition. During the search, investigators also found a Dominican identification card belonging to WANDER.

14.     On September 24, 2020, a Boston federal grand jury returned a two-count indictment charging SANTIAGO with distribution of and possession with intent to distribute 400 grams or more of fentanyl (Count One) and conspiracy to distribute five kilograms or more of cocaine (Count Two) [Dkt. No. 20-CR-10207-MLW]. SANTIAGO pled guilty in that case and his sentencing is scheduled for February 22, 2023. Since December 10, 2020, SANTIAGO has been on pretrial release.

Drug seizures from the CUELLO-NUNEZ DTO

November 17, 2022: investigators seized over 500 grams of fentanyl and 96 grams of cocaine base.

15.     On November 17, 2022, calls intercepted over SANCHEZ's phone indicated that he and TULILE were enroute to deliver drugs to a customer believed to be in Maine.  At the request of investigators, the New Hampshire State Police stopped the Ford Explorer that SANCHEZ and TULILE were driving. The trooper informed SANCHEZ and TULILE that the Explorer would be towed because neither was the registered owner. After the Explorer was towed to a New Hampshire police barrack, investigators searched it and located approximately 54 "fingers" of a substance that

field tested positive for fentanyl, and 96 grams of cocaine base.[1] After the stop, CUELLO-NUNEZ, SANCHEZ, WANDER, and TULILE were intercepted discussing the stop and seizure.

January 11, 2023: Investigators seize 10 pounds of methamphetamine and 5 kilograms of fentanyl

16.     On January 10, 2023, investigators intercepted a call between CUELLO-NUNEZ (using Target Telephone 6) and TULILE indicating that a package containing drugs was being delivered on January 11, 2023. After intercepting the address where the package was being delivered ("126 brook ave Dorchester"), investigators went to the location and observed TULILE pick up a UPS package and hand it to JOSE VAZQUEZ, who placed the package in the trunk of his vehicle and departed the area. At the direction of investigators, a Massachusetts State Police trooper stopped JOSE VAZQUEZ's vehicle and recovered the package from the trunk. Investigators searched the package, which contained approximately 10 pounds of a substance that field tested positive for methamphetamine. Later that day, investigators again stopped JOSE VAZQUEZ and seized approximately one and a half kilograms of a substance that field tested positive for fentanyl. Investigators identified a storage facility located at 41 Norwood Street in Dorchester where JOSE VAZQUEZ rented a unit. Investigators searched the unit and seized an additional four kilograms of suspected fentanyl and metal equipment used to press drugs.

January 13, 2023: Investigators seize 10 pounds of methamphetamine

17.     On January 12, 2023, investigators received information that a package containing drugs was being delivered the following day to 17 Verrill Street in Mattapan. On January 13, 2023, investigators went to the UPS office in Norwood, Massachusetts and took possession of a package destined for 17 Verrill Street. Pursuant to a warrant, investigators opened the package, which

---

[1] All of the drugs seized during the investigation were sent to the DEA Laboratory for analysis. The analysis confirmed the 96 grams of cocaine base; the results for the other seizures are pending.

contained approximately 10 pounds of a substance that field tested positive for methamphetamine. Calls intercepted after the package was seized indicated that CUELLO-NUNEZ was the intended recipient of that package.

> SANTIAGO was intercepted over Target Telephones 6 and 8 ordering drugs and discussing his drug business.

18.     On January 4, 2023, at 4:59 p.m., SANTIAGO used the 7080 Number to call SANCHEZ over Target Telephone 8. SANTIAGO said he needed to talk to SANCHEZ. SANCHEZ said he would send SANTIAGO the address to meet. After ending the call, SANCHEZ sent text messages to the 7080 Number with his address ("39 Calumet st Boston ma") and asked SANTIAGO to call him when he arrived ("Call me when you get here."). At 5:20 p.m., SANCHEZ called SANTIAGO over the 7080 Number and asked if he was on his way. SANTIAGO affirmed, and SANCHEZ said he was on his way to "Rosedale." SANTIAGO agreed to meet him at Rosedale. At 6:35 p.m., SANCHEZ called the 7080 Number and told SANTIAGO he had arrived. SANCHEZ asked for a description of SANTIAGO's car, and SANTIAGO replied he was in the "white BMW."[2] On numerous occasions during the course of the investigation, CUELLO-NUNEZ and SANCHEZ directed drug customers to meet them or couriers on Rosedale Street in Dorchester to pick up drugs.

19.     On January 5, 2023, at 5:32 p.m., CUELLO-NUNEZ used Target Telephone 6 to call SANCHEZ over Target Telephone 8. SANCHEZ told CUELLO-NUNEZ to call SANTIAGO ("Listen, call my nephew. He wants to speak with you."). CUELLO-NUNEZ asked, "Which nephew?" SANCHEZ replied, "Jovani." SANCHEZ said SANTIAGO wanted to turn over some

---

[2] I know that a white 2012 BMW sedan bearing Massachusetts registration CS42CE is registered to SANTIAGO at the address for the Target Location.

of his drug customers to CUELLO-NUNEZ before he (SANTIAGO) went to jail ("He has like four, seven people. To see if he can leave them for you before he goes in."). CUELLO-NUNEZ agreed ("Alright."). SANCHEZ explained he had met with SANTIAGO, and that SANTIAGO said he still had connections to Mexican drug suppliers but that he did not want to purchase from them because he was going to soon be sentenced in his criminal case ("He came talk to me. He just called me about the girl Kayley who has a construction, she called him about giving her a sample . . . I spoke with him the day before yesterday, and he told me, 'Speak with your [unintelligible] to see if he can . . . with me.' Because he still has the Mexicans over there, but he can't get into that right now because supposedly he's going to do some time."). CUELLO-NUNEZ told SANCHEZ to call SANTIAGO to set up a meeting ("Call him now, so we can meet up later."). SANCHEZ said he was meeting SANTIAGO at 7:00 p.m. on Rosedale Street ("We're going to meet in Rosedale at 7:00 p.m."). CUELLO-NUNEZ agreed to meet SANTIAGO ("So call him, and we'll meet there.").

20.     At 6:59 p.m., SANCHEZ called SANTIAGO over the 7080 Number to confirm the meeting ("You're going to meet me over there at 7:00?"). SANTIAGO asked, "Where, Rosedale?" and SANCHEZ affirmed. SANTIAGO agreed ("Yeah, I'll meet you. I'll head over there."). SANCHEZ said that CUELLO-NUNEZ was going to meet with SANTIAGO to discuss taking over SANTIAGO's customers ("Hey Chompi's gonna be over there so you could talk."). SANTIAGO said he was on his way ("I'm gonna be over there right now. I'm on my way over there.").

21.     At 7:22 p.m., SANTIAGO called SANCHEZ to let him know he had arrived on Rosedale Street ("Yo, I'm here. I'm outside . . . I mean I'm outside in front of Rosedale."). SANCHEZ said he was parked further down the street ("I'm down here parked by where Brandon

lives in the white truck. Park further down."). SANCHEZ told SANTIAGO to park near him so he

could let CUELLO-NUNEZ know they were together ("Park on the side. On the right hand side

there's a parking . . . So I can tell Chompi that we both together at the same parking spot already.").

SANTIAGO acknowledged that he saw SANCHEZ's vehicle ("I see you."). SANCHEZ told

SANTIAGO to get into his vehicle so they could call CUELLO-NUNEZ ("Come here

SANTIAGO to call Chompi.").

22.     Two minutes later, SANCHEZ called Target Telephone 6 and spoke to CUELLO-

NUNEZ. SANCHEZ said he was with SANTIAGO ("The nephew is here."). CUELLO-NUNEZ

replied that he was on his way to meet them ("Alright, let me go over there, give me a minute.").

CUELLO-NUNEZ told SANTIAGO to send WANDER to deliver drugs to a customer, and

SANCHEZ replied that he would go with WANDER and that SANTIAGO would wait for

CUELLO-NUNEZ ("So I will go with him . . . The nephew is going to wait for you here in a white

BMW."). CUELLO-NUNEZ told SANCHEZ to wait for him to arrive ("You wait for me over

there . . . Wait for me, so you are there when I'm talking with him. I'll see you soon."). The location

data for Target Telephone 8 indicated it arrived in the vicinity of Rosedale Street around 7:00 p.m.,

and the location data for Target Telephone 6 was in the vicinity of Rosedale Street between 7:30

and 8:15 p.m.

23.     Later at 8:17 p.m., CUELLO-NUNEZ used Target Telephone 6 to call SANCHEZ

over Target Telephone 8. CUELLO-NUNEZ told SANCHEZ that SANTIAGO wanted to buy

drugs to sell to his customers ("He just wanted something for himself. He would like to get a hold

of something to serve some white people that he knows."). SANCHEZ told CUELLO-NUNEZ to

sell the drugs to SANTIAGO ("Well, sell to him."). CUELLO-NUNEZ said he would the

following day ("Yes, but tomorrow."). SANCHEZ explained that SANTIAGO was facing a five

year term of imprisonment and wanted to give CUELLO-NUNEZ some of his customers before he went to jail ("Well, but supposedly he is facing five years in February and he'll be leaving them for us, don't worry. I know like three of the girls, but I don't have their numbers . . . And the one that he has now, Katie, she lives over there by where you used to live, in West Roxbury, by Eldridge Street."). CUELLO-NUNEZ said they could make an arrangement with SANTIAGO and that SANTIAGO only wanted to transfer his good customers to CUELLO-NUNEZ and SANCHEZ ("Then we will talk to him to see what he wants to do because he wants to grab special people, the ones that he knows very well."). SANCHEZ said SANTIAGO would take a cut of the sales to his customers and that SANTIAGO wanted CUELLO-NUNEZ to supply his customers until he (SANTIAGO) was released from jail, at which time he would take them back ("He wants to make two or three bucks from that, but he will leave them to us, don't worry. We will work with them until he gets out in five years."). CUELLO-NUNEZ said SANTIAGO told him he could get probation instead of jail time ("He's going to do probation. He says that the lawyer says that they will give him probation."). SANCHEZ said SANTIAGO would not be able to continue to serve all of his drug customers if he were sentenced to federal supervised release ("He might get probation, yes, but if he is doing probation he is not going to risk getting in that. So, then we talk and it's better for them to give a little bit because otherwise they watch you on probation. Probation is not easy. And you'll see that it's going to be federal.").

24.     On January 7, 2023, at 4:09 p.m. SANTIAGO used the 7080 Number to call CUELLO-NUNEZ over Target Telephone 6. SANTIAGO asked if CUELLO-NUNEZ could give the drugs that SANTIAGO wanted to SANCHEZ because SANTIAGO had customers waiting to buy the drugs, and he planned to tell the customers that CUELLO-NUNEZ would begin selling to them in the future ("Hey, about what we talked about the other day . . . Alright, to see if you can

give it to my uncle, and tomorrow I am going to see some of my people to tell them . . . If you can

today, better yet, you heard?").   CUELLO-NUNEZ told SANTIAGO to call SANCHEZ so that

SANCHEZ could pick up the drugs ("Call him, alright, so he comes by me.").

25.     At 4:10 p.m., SANTIAGO called SANCHEZ over Target Telephone 8. SANCHEZ

asked if he had spoken to CUELLO-NUNEZ ("Did you speak to him?"). SANTIAGO affirmed

and said SANCHEZ needed to pick up the drugs for him ("Yeah, I just spoke to him now. He said

if you could, whenever you can go by to get it . . . And when you get it, let me know."). SANCHEZ

agreed and said he would call SANTIAGO back when he had the drugs ("Okay, so I'll call you

like in another 45 minutes.").

26.     Later that night, at 9:36 p.m., SANTIAGO used the 6392 Number to call

SANCHEZ. SANCHEZ asked who was calling because he did not recognize the phone number,

and SANTIAGO replied he had just purchased a new phone ("J. I just got this phone right now.").

SANCHEZ said he had just left CUELLO-NUNEZ's house ("Damn, bro, I was just in the dude's

house, man."). SANCHEZ explained he was on Rosedale Street and would have to go back to pick

up the drugs ("I just parked on Rosedale . . . I went to his house. Let me call him so he can bring

that. Give me that shit."). SANTIAGO said he had to go to work and asked if he could pick up the

drugs the following day ("Nah, nah, nah, it's cool . . . I gotta go to work. Tomorrow, can we meet

up tomorrow?"). SANCHEZ agreed. SANTIAGO thanked SANCHEZ ("Alright. I love you

uncle."). SANCHEZ confirmed that the 6392 Number was SANTIAGO's new phone number ("I

love you too. Be careful. That's your new number?"). SANTIAGO confirmed ("Yeah, I just got

it. Yup.").

27.     On January 8, 2023, at 7:17 p.m., SANTIAGO used the 7080 Number to call

CUELLO-NUNEZ over Target Telephone 6. SANTIAGO asked if CUELLO-NUNEZ had spoken

to SANCHEZ ("Have you spoken to my uncle?"). CUELLO-NUNEZ said he talked to SANCHEZ

the prior day about the drugs SANTIAGO wanted to buy ("I haven't spoken with that faggot since

yesterday when I told him about that thing, and I haven't been able to communicate with him.").

SANTIAGO said he planned to meet SANCHEZ later to pick up the drugs ("I spoke with him

yesterday . . . I told him I will see him today when I get off work. I've been calling him since like

1:00 in the afternoon."). CUELLO-NUNEZ asked SANTIAGO which drugs he needed ("But let

me know what you need, and we can take care of it."). SANTIAGO said he would call CUELLO-

NUNEZ back from a new phone ("Yes, I needed to do something today. But I'll call you right

back. I bought a new phone just a heads up so when you see the number calling you.").

28.     Three minutes later, at 7:20 p.m., SANTIAGO used the 6392 Number to call

CUELLO-NUNEZ. SANTIAGO confirmed it was his new number ("It's me . . . This is the new

one . . . You can call me at this one.") and asked if they could meet later that day or the following

day to pick up the drugs ("I don't know if I could meet with someone or maybe tomorrow.").

CUELLO-NUNEZ agreed ("That's up to you. You can do it now or tomorrow."). SANTIAGO

said he had a female customer who was waiting to buy the drugs ("Yeah, because I have that chick

I told you about, and she is waiting on me for today. If you're too busy I don't want to bother

you."). CUELLO-NUNEZ replied he wanted to get the drugs to SANTIAGO that day ("Let's do

it today. No worries."), and SANTIAGO agreed ("Alright. I will call you when I'm around

Boston.").

29.     At 7:42 p.m., SANTIAGO used the 6392 Number to call CUELLO-NUNEZ.

CUELLO-NUNEZ told SANTIAGO to go to Talbot Street ("Head that way. You know where

Talbot is?"). SANTIAGO affirmed ("Yes"), and CUELLO-NUNEZ told SANTIAGO to go to the

area of 230 Talbot Street ("You can go to 230 or 250.").[3] SANTIAGO said he would arrive in about 15 minutes ("Alright. I will arrive there in like 15."). At 8:00 p.m., SANTIAGO used the 6392 Number to send a text message to CUELLO-NUNEZ letting him know he would be arriving soon ("I'll be there in 5 min.").

30.     At 8:05 p.m., SANTIAGO used the 6392 Number to call CUELLO-NUNEZ. SANTIAGO asked if he could meet CUELLO-NUNEZ at a different location because he was concerned about conducting the drug transaction on Talbot Street ("Do you want to see me where I saw you better? Because this street is too open. You know?"). CUELLO-NUNEZ explained he did not have a car and told SANTIAGO to park near 230 Talbot Street ("Head to 230. Park around those buildings."). SANTIAGO agreed ("That's fine . . . I'll be there.") and then confirmed he had arrived and would be waiting ("Alright, I'm already here . . . I'll be waiting.").

31.     At 8:22 p.m., CUELLO-NUNEZ called the 6392 Number and spoke with SANTIAGO. CUELLO-NUNEZ said the courier was walking on Talbot Street to deliver the drugs ("The guy is walking. You don't see him?"). SANTIAGO said he was parked across from 241 Talbot Street ("I'm across 241 in my car."). CUELLO-NUNEZ gave a description of what the courier was wearing, and SANTIAGO confirmed that he saw him ("I see him."). At 8:27 p.m., SANTIAGO sent CUELLO-NUNEZ text messages thanking him for the drugs ("Thank you my king . . . Very much.").

32.     On January 13, 2023, SANTIAGO used the 6392 Number to call CUELLO-NUNEZ. SANTIAGO asked if he could talk freely over the phone ("Can we talk on here or not?") and CUELLO-NUNEZ affirmed ("Yes, talk to me. What's up?"). SANTIAGO said he wanted to

---

[3] TULILE resided at 263 Talbot Street in Dorchester, and intercepted calls indicated that the DTO stored drugs at this location.

purchase more drugs the following Monday ("Maybe for Monday, around there."). Based on the prices quoted for the drugs later in the call and the description of the drugs, investigators believe SANTIAGO had purchased fentanyl on September 8 on Talbot Street and wanted to purchase an additional kilogram of fentanyl. CUELLO-NUNEZ agreed ("Alright."). SANTIAGO said that the fentanyl the courier had given him was different from fentanyl he had previously gotten from SANCHEZ ("But listen, that stuff this guy gave me, right . . . It was not the same with . . . My uncle gave me some stuff that had like little black stains . . . Can it be that same shit?"). CUELLO-NUNEZ explained that the fentanyl with the black stain was potent ("Okay, the thing is that I have that done a bit on the lower . . . I've added less to it."). SANTIAGO said he would pay $40,000 to $45,000 for a kilogram of fentanyl if it were stronger ("Oh, okay, okay. Referring to my stuff, right, if you want to charge me the 40-45, I don't mind, since you are saying that, that one can hold a lot more, right?"). CUELLO-NUNEZ confirmed that the fentanyl with the black stain indicated it was strong ("Yes, the thing is my stuff is something special, you understand? That's why it has that black stain."). CUELLO-NUNEZ explained he intentionally prepared the fentanyl to have the black stain so customers would know he had prepared it ("Whoever I give that to, they know it comes from me."). SANTIAGO said he liked the cutting agent that CUELLO-NUNEZ used to mix the fentanyl ("I think that the cut is working well with it. Like it can be used through the nose."). CUELLO-NUNEZ replied that the color was different because the other batch of fentanyl he had sold to SANTIAGO was weaker because SANTIAGO had asked him to add more cut ("No-no, it's the same. It's not that. The thing is more was added to it, you told me to add five."). SANTIAGO referred to one batch of fentanyl that was gray in color ("Because it was gray."). CUELLO-NUNEZ said those drugs were prepared with less cut ("I have that prepared like at a two and a half."). SANTIAGO again asked if CUELLO-NUNEZ had used different cut when

14

preparing the two batches ("Yeah, the thing is the one that I got from you was like a lot whiter and this one is like gray, so I thought that it was the cut . . . That maybe it was because it was a different cut."). CUELLO-NUNEZ agreed and said he could sell SANTIAGO the kilogram when he was ready ("That's fine. Just call me, and I'll see you when you, just let me know ahead of time."). SANTIAGO agreed and said he would pay $45,000 or $50,000 for the kilogram as long as it was strong enough for him to add additional cut before diluting it and selling it to his customers ("Alright then. Look, I wanted to tell you, I'm going to pay you the 45. You heard? . . . I'm saying, I can even pay you like 50, I don't mind. But I want it to hold a ten, and you can throw the cut on that for me, you heard?"). CUELLO-NUNEZ agreed ("Alright."). SANTIAGO said he was going to talk to SANCHEZ and CUELLO-NUNEZ about transferring his customers to CUELLO-NUNEZ and SANCHEZ ("And about the other. About my other for my people. This week I'm also going to talk to him. I'mma give you, you already know. I'm about talk to you about this."). CUELLO-NUNEZ agreed ("Alright.").

33.     On January 24, 2023, at 2:04 p.m., SANTIAGO used the 6392 Number to call CUELLO-NUNEZ. SANTIAGO asked if CUELLO-NUNEZ had spoken to SANCHEZ because SANTIAGO could not reach him ("A question, two questions. Have you spoken to my uncle? . . . I have been trying to call him and he is not picking up."). SANTIAGO asked if he could meet with CUELLO-NUNEZ later that night or the following day to pick up drugs ("Okay, and it was to see if you are going to be around later . . . I get out of work late, like 10:30. I don't know if that is too late for you, if not in the morning. I don't know."). CUELLO-NUNEZ agreed ("Okay, no problem. Do not worry."). SANTIAGO said he would call when he was available ("Okay, I will call you Papi.").

34.     Later that night, at 10:56 p.m., SANTIAGO used the 6392 Number to call CUELLO-NUNEZ. CUELLO-NUNEZ said he had gone home because he had not heard from SANTIAGO ("I'm laying now. I thought you'd forgotten. I came home."). SANTIAGO asked if he could pick up the drugs the following day if it was too late to meet that night ("But if it's not possible today, we can leave it for tomorrow in the morning, or something."). CUELLO-NUNEZ agreed ("Alright, brother."). SANTIAGO confirmed he wanted to purchase a kilogram, which he would pay CUELLO-NUNEZ $50,000 to buy ("If you could prepare it for me, the 45. But I'll give you 50, you heard?"). CUELLO-NUNEZ agreed ("Alright, brother."). SANTIAGO said he would pick up the kilogram the following day and that he wanted to talk to CUELLO-NUNEZ privately ("And, you already know. So, it'll be that, prepare it for me, and tomorrow, I'll see you . . . I also have to have a sit down with you to speak privately about something."). CUELLO-NUNEZ agreed. Based on the kilogram price, I believe SANTIAGO was planning to purchase a kilogram of fentanyl from CUELLO-NUNEZ. After this call, investigators did not intercept any further calls between CUELLO-NUNEZ and Santiago.

The Target Location

35.     **60 Tyler Street, Apartment #1, Boston, Massachusetts** is a multi-unit residence with yellow siding, black shutters, and a grey-shingled roof. The Target Location is apartment #1, which is the first floor apartment and basement. The Target Location can be accessed through either the front door labeled "60" or an outside entrance in the rear of the building.  A detailed description and photograph of the Target Location appear in Attachment A, which is attached hereto and incorporated herein by reference.

36.     I believe SANTIAGO resides at this location because the address is listed as his residential address on his Massachusetts driver's license and SANTIAGO's white BMW is

registered in his name at the address for the Target Location. On February 12, 2023, investigators observed the white BMW parked in the driveway of 60 Tyler Street. Additionally, a search of public records indicates that SANTIAGO owns a business, Santiago General Contracting LLC, and that business address is listed as the Target Location. Moreover, as detailed above, in 2020, investigators searched the Target Location subsequent to arresting SANTIAGO. At that time, SANTIAGO was residing at this location.

37.     As detailed in this affidavit, SANTIAGO was intercepted using two different phones to order drugs from CUELLO-NUNEZ and to communicate with SANCHEZ. As detailed above, SANCHEZ told CUELLO-NUNEZ that SANTIAGO wanted to give them some of his drug customers so that they could continue to supply drugs to the customers if SANTIAGO were sentenced to prison in February 2023 on his pending federal drug charges. Accordingly, I believe that evidence of SANTIAGO's ongoing drug trafficking activities, including records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and drug proceeds, as set forth in Attachment B, will be found at the Target Location.

### Drug Traffickers' Use of Residences and Cell Phones Generally

38.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a.     Controlled substances.

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.      Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.      Firearms and ammunition;

j.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

k.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

39.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common

practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

40.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

41.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.

Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

42.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

43.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

44.     During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have

other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

45.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  As described above, SANTIAGO was intercepted using two cellular telephones to communicate with CUELLO-NUNEZ and SANCHEZ to arrange drug purchases and meetings to discuss drug purchases. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

46.     Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells,"

enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

47.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by

other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

48.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e mail, electronic messages, and updates to online social networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

49.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a)      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b)      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d)      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

### Unlocking Devices Using Biometric Features

50.      I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device, and/or content contained on the device, via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

51.      On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via

Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

52.     The passcodes that would unlock SANTIAGO's devices (hereinafter, the "Target Devices") found during the search of the Target Location are not currently known to law enforcement. However, during the course of this investigation, a number of Target Subjects have used Apple iPhones to conduct their drug business. Thus, it may be useful to press the finger(s) of the user(s) of the Target Devices found during the search of the Target Location to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device, and/or content within the device, for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

53.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location

to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

54.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of SANTIAGO to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

55.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## Conclusion

56.     Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking in violation of the Target Offenses. I believe that evidence of their drug trafficking offenses will be found inside the Target Location and on certain cellular telephones seized therefrom.

I, Sean Geary, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

SEAN GEARY
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ___th day of February 2023.

**Feb 14, 2023**

HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

27